[Cite as *In re J.W.*, 2019-Ohio-210.]

STATE OF OHIO          )          IN THE COURT OF APPEALS
                         )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: J.W.                             C.A. No.     28976
      M.H.
      D.H.
      F.V.

                                  APPEAL FROM JUDGMENT
                                  ENTERED IN THE
                                  COURT OF COMMON PLEAS
                                  COUNTY OF SUMMIT, OHIO
                                  CASE Nos.    DN 16-08-000635
                                                    DN 16-08-000636
                                                DN 16-08-000637
                                                    DN 16-08-000638

DECISION AND JOURNAL ENTRY

Dated: January 23, 2019

CALLAHAN, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and granted permanent custody of the children J.W., M.H., D.H., and F.V. to Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

{¶2} This decision replaces this Court's prior decision issued on September 26, 2018, pursuant to our journal entry issued on October 24, 2018, only as to Mother's prior appeal. The remainder of the September 26, 2018 opinion as it relates to C.A. No. 28966 remains in full force and effect.

I.

{¶3} Mother moved this Court to reconsider our prior decision dismissing her appeal in C.A. No. 28976 for failure to file a timely appellate brief. We granted reconsideration and

allowed Mother to file her brief for later consideration by this Court. CSB was granted the opportunity to file a responsive brief.

{¶4} Mother is the biological mother of J.W. (d.o.b. 2/22/10), M.H. (d.o.b. 7/26/13), D.H. (d.o.b. 7/26/13), and F.V. (d.o.b. 5/4/15). The parental rights of the father of F.V. were terminated in C.A. No. 28966. The biological fathers of J.W., M.H., and D.H. did not participate in the cases below and are not parties to this appeal.

{¶5} In August 2016, the Akron Police Department investigated a report that the children were being locked in a room in an unsanitary and unsafe home where Mother resided with her then-husband.[1] Based on the filthy conditions and lack of food in the home, as well as the confinement of the children to a single room, the police removed J.W., M.H., D.H., and F.V. from the home and placed them in the protective custody of CSB. The agency filed complaints alleging that all four children were abused (endangered), neglected, and dependent. At the adjudicatory hearing, CSB withdrew its allegations of abuse, and the juvenile court found each child to be neglected and dependent. The children were placed in the temporary custody of the agency after the dispositional hearing, and the juvenile court adopted the case plan as the order of the court. The court later maintained the children in the temporary custody of CSB after a review hearing.

{¶6} In June 2017, CSB filed a motion for permanent custody in which it alleged that the children could not or should not be returned to Mother within a reasonable time based on her failure to remedy the conditions which gave rise to the children's removal. The agency alleged

---

[1] Mother's then-husband is not the biological father of any of the children at issue in this case.

that all the fathers had abandoned their children. Moreover, it alleged that an award of permanent custody was in the children's best interest. Mother orally moved for a first six-month extension of temporary custody at the final dispositional hearing. At the conclusion of the two-day permanent custody hearing, the juvenile court denied all motions for a six-month extension of temporary custody, granted CSB's motion for permanent custody, and terminated all parental rights as to each of the four children. Mother filed this appeal. She raises one assignment of error for review.

## II.

### ASSIGNMENT OF ERROR

THE TRIAL COURT'S FINDING THAT GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO SUMMIT COUNTY CHILDREN'S SERVICES WAS IN THE BEST INTEREST OF THE CHILD[REN] IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Mother argues that the juvenile court's finding that an award of permanent custody to CSB was in the children's best interest was against the manifest weight of the evidence. This Court disagrees.

{¶8} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶9}** Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶10}** Based on the plain language of her stated assignment of error, Mother purports to challenge solely the juvenile court's second-prong finding that an award of permanent custody was in the best interest of the children. Rather than citing and focusing her argument on the best interest factors set out in R.C. 2151.414(D)(1)(a)-(e), however, Mother cites the first-prong factor set out in R.C. 2151.414(B)(1)(a) and addresses matters more relevant to the juvenile court's first-prong finding that the children cannot be placed with Mother within a reasonable

time or should not be returned to her. Nevertheless, because of the significant fundamental interests implicated when a parent loses custody of children, as well as facts which are arguably relevant to both a first-prong and second-prong discussion, this Court will conduct a manifest weight analysis regarding both prongs of the permanent custody test.

{¶11} In its motion for permanent custody, CSB alleged as its sole first-prong ground relative to Mother that the four children could not be placed with her within a reasonable time or should not be placed with her pursuant to R.C. 2151.414(B)(1)(a). In support, the agency alleged only two Subsection (E) factors as to Mother. Specifically, it alleged that (1) Mother continuously and repeatedly failed to substantially remedy the conditions that caused the children's placement outside the home pursuant to R.C. 2151.414(E)(1); and (2) Mother demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with the children when Mother was able to do so pursuant to R.C. 2151.414(E)(4). After the permanent custody hearing, the juvenile court found in regard to the first prong that CSB had met its burden of proving that the children could not be returned to Mother within a reasonable time because Mother had failed to substantially remedy the conditions that led to the removal of the children from Mother's home. As the juvenile court based its first-prong finding solely on the R.C. 2151.414(E)(1) factor, we likewise constrain our discussion.

{¶12} R.C. 2151.414(E) provides, in relevant part:

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot by placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶13} To her credit, Mother had earlier acknowledged certain issues with the children and was voluntarily cooperating with services providers. In fact, six months before CSB's involvement with the family, a developmental specialist at the Summit County Developmental Disabilities Board ("Summit DD") began working with two-and-a-half-year-olds D.H. and M.H. and the nine-month-old F.V. in Mother's home to address the children's delays. The twins required intervention to improve their communication skills, as they were not using any language. F.V. required assistance with gross motor skills. Although she was sitting, she could not crawl or hold a bottle. The specialist determined that the children's delays were completely environmental, rather than medically-based. The specialist never saw J.W. in the home until four months later, when she witnessed the child have to sit in a time-out for her entire two-hour-and-fifteen-minute session with the other children. At one point during that time, the specialist heard Mother's husband tell J.W. that he was going to "f*** [the child] up." Based on the home environment, the Summit DD specialist made a referral to CSB. Afterward, Mother refused to continue with services or return the specialist's calls, despite the children's ongoing need for services to address their delays. [2]

---

[2] Mother was not subject to court-ordered case plan objectives at the time she began refusing ongoing Summit DD services for the children. Accordingly, this Court clarifies that we do not consider Mother's refusal to cooperate at that time for purposes of her failure to remedy problems pursuant to R.C. 2151.414(E)(1).

{¶14} After investigating the home environment, CSB removed the children from Mother's home based on deplorable conditions therein. The home had no working stove or refrigerator, there was no food in the home, the children did not have beds, the home was infested with roaches, and the children were being confined together in a room secured with plywood for eight to nine hours each day by Mother's husband. After an adjudicatory hearing, at which Mother waived her right to an evidentiary hearing, the juvenile court adjudicated all four children neglected and dependent. CSB established case plan objectives designed to help Mother remedy these problems. The juvenile court adopted the case plan as the order of the court after initial disposition of temporary custody to the agency. Under the terms of the case plan, Mother was required to demonstrate that she could meet the basic needs of the children. Specifically, Mother was ordered to participate in parenting classes; submit to cognitive and mental health assessments and follow all recommendations; participate in domestic violence education; obtain and maintain employment and income sufficient to provide for food, housing, and other basic needs; engage with the Akron Metropolitan Housing Authority ("AMHA") to obtain safe, sanitary, and stable housing; and link the children with appropriate service providers to meet their special needs.

{¶15} When orally moving for a six-month extension of temporary custody at the permanent custody hearing, Mother conceded that she did not yet have stable housing. She asserted, however, that she had made significant progress on her case plan objectives. On appeal too, Mother argues that the evidence at the hearing demonstrated that her case plan compliance was significant enough to warrant an extension of temporary custody. This Court has repeatedly written that, "while relevant to the juvenile court's best interest determination, case plan compliance is not dispositive of the issue." *In re F.W.*, 9th Dist. Summit Nos. 28520 and 28529,

2017-Ohio-5624, ¶ 23, citing *In re T.W.*, 9th Dist. Summit No. 27477, 2016-Ohio-92, ¶ 17; *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 22; and *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21.

{¶16} The first protective caseworker assigned to Mother's case testified that he took Mother to Greenleaf for an initial appointment for parenting classes in September 2016, but Mother failed to follow up with providers there. He also referred Mother to the Battered Women's Shelter for domestic violence counseling, but Mother failed to engage in those services under his watch. Due to Mother's transportation issues, the caseworker tried to coordinate the bulk of Mother's services at one location. Even so, Mother at best only completed some initial assessments and failed to further engage in services. Although Mother always told the caseworker that she was engaging in services, he learned upon calling to verify Mother's compliance that she had not contacted any of the service providers.

{¶17} After the children were removed from Mother's home, she continued to reside in that home for several months, but left because of drug activity in the home. Thereafter, Mother lived with a friend, but that home was not appropriate because the friend had lost custody of her own children. Mother contacted AMHA, but she still did not have housing when a second protective caseworker assumed her case in January 2017. In addition, up until that time, while Mother was working for a temporary employment service, she was not receiving consistent job assignments.

{¶18} Mother's second caseworker gave her a list of housing resources at their first meeting because Mother had no housing. At the time of the permanent custody hearing, the caseworker testified that Mother still had no housing and she did not know where Mother was living. Mother, however, was on the AMHA's list for housing. Because Mother had requested a

three-bedroom home, it was unknown how long it would take for her to secure one of those rare residences. Mother informed the caseworker that she was number 30 on the housing list.

{¶19} The caseworker verified that Mother completed domestic violence education at the Battered Women's Shelter in January 2017. Although Mother completed a mental health assessment at Greenleaf, a subsequent sanction resulted in the loss of her medical insurance. Mother was diagnosed with major depressive disorder. Because she was unable to pay her counseling bill, she was unable to engage in the recommended mental health counseling. It was not until September 2017, that Mother went to Urban Ounce of Prevention, where she completed seven counseling sessions by the time of the hearing. Urban Ounce of Prevention was providing wrap-around services with Portage Path Behavioral Health to get Mother necessary medications.

{¶20} Mother completed one-half of the required parenting classes at Akron Pregnancy Center, but she failed to follow through with that program. At the time of the first day of the hearing, Mother merely had a parenting class intake appointment scheduled at Urban Ounce of Prevention. Although Mother completed a STARS drug and alcohol assessment in February 2017, she failed to follow through with her recommended outpatient treatment. She completed a urine screen in March 2017, which was positive for marijuana. After that, the caseworker was unable to contact Mother to schedule semi-monthly drug screens, because Mother's phone was either turned off or she was not accepting calls. Although Mother had obtained a job at Wendy's, by the time of the hearing she had lost that job. The caseworker testified that, after more than a year, Mother was no closer to obtaining housing and she had not indicated how she would support these four children with no income, particularly given her additional financial responsibilities. In particular, Mother had an older child in the legal custody of a relative in New Jersey, and she was pregnant with a sixth child at the time of the hearing.

{¶21} Two months later, on the second day of the permanent custody hearing, the caseworker testified that Mother had not followed through with parenting classes at Urban Ounce of Prevention. She had, however, reengaged in parenting classes at the Akron Pregnancy Center one to two weeks before the hearing. The caseworker did not know how many classes Mother had left to complete, because the contact person at the pregnancy center did not respond to her inquiry.

{¶22} Mother failed to make additional progress in terms of securing housing. She only contacted AMHA to follow up the day before the second day of the hearing. Mother had given birth to her sixth child. AMHA refused to put Mother on the list for a four-bedroom home, however, without verification from CSB that housing was the last case plan objective Mother had to complete. Because Mother still had outstanding case plan objectives to address, specifically parenting classes and mental health counseling, the agency could not honestly provide Mother with the necessary verification.

{¶23} Mother testified that she understood her case plan objectives, and she was able to recite all of them. She asserted that her drug and alcohol assessment gave rise to no recommendations. She admitted testing positive for marijuana on one occasion, but she claimed all additional screens were negative. Mother also admitted that the possible father of her most recent child is incarcerated for drug possession, although she denied spending time with him when he was using drugs.

{¶24} Mother testified that she had recently finished three out of ten parenting classes. She expected to finish by the end of March 2018. She asserted that she had learned to keep her children safe and to pay attention to who has contact with them. Mother testified that she has a protection order against her prior husband, although the children are not covered by that order

because they are in the temporary custody of CSB. Mother claimed that she no longer has a relationship with her newest child's possible father. She did not identify the other possible fathers of that child. The father of Mother's twins is a registered sex offender, but he is no longer involved in the children's lives. Mother did not testify regarding whether or not she maintains any kind of relationship with any of the fathers of her other children.

{¶25} Urban Ounce of Prevention had transferred Mother to Portage Path Behavioral Health, and she had an appointment scheduled for the following week to assess her medication needs. Mother was not currently on medication due to her recent pregnancy. Mother also claimed to have an appointment scheduled to see a mental health counselor the following week.

{¶26} Less than two weeks before the hearing, Mother obtained full-time employment at Burger King, earning $8.50 per hour. She had also contacted AMHA about securing housing. She claimed that they would initiate a background check on her the following week if she provided appropriate documentation. She did not elaborate as to what kind of documentation was required, or why she had not provided it much earlier to obtain housing. Mother admitted that she was still "bouncing from place to place until [she] get[s] housing."

{¶27} No fewer than six CSB employees, including two protective caseworkers, two social work assistants, one family support specialist, and one visitation supervisor, as well as the guardian ad litem, supervised Mother's visitations with the children. Every visitation supervisor expressed the same significant and ongoing concern that Mother yelled at and used a consistently harsh tone with the children. In addition, all seven observers testified that Mother struggled to redirect the children, give each the necessary attention, and maintain her composure. The visitations were described as hectic, chaotic, and unstructured. The family support specialist described Mother's interaction with the children as "sporadic." On occasion, Mother brought

other people with her to visitations, which concerned CSB, because the agency had no information about those visitors.

{¶28} Mother interacted well with the children in a one-on-one situation, but she was unable to manage all four children at once. Mother told a caseworker not to let the foster mother dress the twins in matching outfits because she could not tell the girls apart. Mother was observed to be highly upset by the level of supervision during visitation, even sobbing that she was unable to parent when closely watched. After Mother was permitted to have monitored visitations in public, the guardian ad litem observed that Mother had difficulty keeping the children's attention. After staff at the Family Interaction Center coached and redirected Mother, her visits with the children improved somewhat.

{¶29} Despite some participation by Mother in services, the guardian ad litem noted that Mother continued to be inconsistent in attending appointments. Moreover, the guardian reported that Mother had not demonstrated that she had learned how to appropriately parent the children. The guardian remained concerned about Mother's poor decision-making skills and her established pattern of relationships with inappropriate men. In addition, Mother had not demonstrated the consistency and stability necessary to indicate that she would be capable of providing for the needs of the children should the juvenile court grant a six-month extension of temporary custody, particularly because temporary custody had already been extended by five months given the timing of the permanent custody hearing. As a result, a first six-month extension would only give Mother an additional month to demonstrate that she had remedied the problems leading to the children's removal. The guardian ad litem expressed serious concern that, even if Mother were to obtain housing immediately, she had not demonstrated her ability to

run a safe household, in light of her limited resources and the hazardous conditions (filth and lack of working utilities) that existed when the children were removed.

{¶30} Based on clear and convincing evidence establishing ongoing concerns about Mother's ability to provide a nurturing, safe, and healthy environment for the children, notwithstanding the agency's reasonable case planning and diligent efforts, Mother failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside of Mother's home. *See* R.C. 2151.414(E)(1). Mother had been receiving community services for three of the children prior to CSB's involvement, but ceased cooperating with Summit County DD after the developmental specialist raised concerns about the children's home environment. She has not sought to participate in the children's ongoing services since their removal. Despite multiple referrals for services, Mother has participated in some cases only in assessments. She is not participating in recommended mental health services, including counseling and medication services. Although she started parenting classes, she stopped participating. Only shortly before the second day of the hearing did she re-engage in a parenting program. While these cases pended for 17 months, Mother never obtained safe, stable, and independent housing, despite CSB's attempts to link Mother with AMHA. In fact, Mother admitted that she remained transient. Moreover, Mother was unable to demonstrate an ability to obtain and maintain employment so that she could support herself and five children, not including another child who was in the legal custody of a relative. Importantly, Mother demonstrated that she had not changed her pattern of engaging in relationships with men who could not provide a safe and stable environment for her children. During the pendency of these cases below, Mother met and became pregnant by one of several men, the likeliest of whom was later imprisoned on drug related offenses. Finally, although Mother's visitations with the

children somewhat improved over time, she continued to express frustration, anger, and a lack of organization with the children. Under these circumstances, the juvenile court did not err by finding that J.W., M.H., D.H., and F.V. could not be placed with Mother within a reasonable time or should not be placed with Mother. CSB established the first prong of the permanent custody test.

{¶31} The juvenile court further found that an award of permanent custody was in the children's best interest. Again, the factors the juvenile court must consider include the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e).

Custodial history of the children

{¶32} All four children were in the custody of Mother until their removals when J.W. was six years old, M.H. and D.H. were three years old, and F.V. was 15 months old. Initially, J.W. and F.V. were placed in a foster home in Cuyahoga County, but were reunited with M.H. and D.H. in a foster home in Summit County a month later. As no suitable relatives were able to provide a home for all four children, the children have continued to live together in the same foster home for almost a year and a half.

Interactions and interrelationships of the children

{¶33} The children took some time to adjust to their foster home, but most issues were resolved quickly. J.W. exhibited some behavioral problems, but in-home weekly therapy has been ongoing to address that. Otherwise, the children are doing well in their foster home, and the foster family would like to adopt all four siblings. The foster family also expressed a

willingness to allow the children to have contact with relatives. Mother has visited with the children, albeit sometimes sporadically. The guardian ad litem reported that a bond exists between Mother and the children. The children have no relationship with their respective fathers, although the father of F.V. visited with her on one occasion shortly before the last day of the hearing.

Wishes of the children

{¶34} J.W. has expressed a desire to live with Mother. The other three children are too young to express their wishes. The guardian ad litem recommended that the children be placed in the permanent custody of CSB as in their best interest based on concerns about Mother's mental health and her ability to parent effectively and keep the children safe.

The children's need for a legally secure permanent placement

{¶35} The children were removed from an unsanitary and unsafe environment in which their basic needs were neglected. The three youngest children all suffered communication delays solely as a result of their environment. Mother had exposed the children throughout their lives to multiple men who posed a risk to the children, including her then-husband, as well as the father of the twins who was a registered sex offender. During the pendency of these cases below, Mother became pregnant and gave birth to her sixth child. The father of that child could have been one of three men, one of whom was incarcerated on drug related offenses.

{¶36} Mother never obtained safe and stable housing for herself, let alone adequate housing to accommodate four or five children. She was frequently unemployed and only recently obtained full-time employment. She had no plans for childcare in the event she regained custody of the children. Because Mother never completed parenting classes or engaged in recommended mental health treatment, she never availed herself of the tools to learn how to

parent the children appropriately to guard their mental, emotional, and physical safety and security. In the absence of her participation in services, Mother was never able to demonstrate that she was capable of providing a nurturing, safe, and stable environment for the four children, all of whom required special services, including counseling. In fact, Mother continued to struggle during visitations to maintain structure and a calm, enriching environment for the children.

{¶37} On the other hand, all four children were together in a foster home, where they were receiving appropriate care and nurturing. The foster family, who expressed a desire to adopt all four children, was meeting all basic needs of the children, as well as ensuring that they were engaged in ongoing therapies and counseling to address their particular developmental and psychological issues. Moreover, the foster family indicated a willingness to promote a relationship between the children and their maternal relatives.

{¶38} The guardian ad litem recommended permanent custody as in the best interest of the children based on concerns regarding Mother's poor decision-making skills, her pattern of engaging in relationships with men who posed a risk to her and the children, her unaddressed mental health issues, her inconsistency in attending appointments geared towards helping her develop good parenting and coping skills, and her failure to demonstrate an ability to keep the children safe.

Applicability of R.C. 2151.414(E)(7)-(11) factors

{¶39} While all three fathers had abandoned the children pursuant to R.C. 2151.414(E)(10), none of the subsection (E)(7)-(11) factors are applicable to Mother.

Conclusion

{¶40} The record demonstrates that the juvenile court did not clearly lose its way and create a manifest miscarriage of justice in finding that it was in the best interest of the children to be placed in the permanent custody of CSB. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. The clear and convincing evidence supports the finding that Mother was unable at the time of the hearing, and would not be able within a reasonable time, to provide an appropriate permanent home for the four children. Despite reasonable case planning and diligent efforts by CSB, Mother failed to obtain housing or demonstrate that she was financially and psychologically able to meet the basic and special needs of the children. In addition, Mother failed to demonstrate that she had modified her pattern of engaging in relationships, and bearing children, with men who posed significant risks to the safety and well-being of her children. Because the children suffered neglect and developmental delays as a result of that environment, the juvenile court did not err by finding that an award of permanent custody was in the best interest of the children.

{¶41} The juvenile court's termination of all parental rights and its award of permanent custody of J.W., M.H., D.H., and F.V. to CSB were not against the manifest weight of the evidence. Mother's assignment of error is overruled.

III.

{¶42} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

LYNNE S. CALLAHAN
FOR THE COURT


HENSAL, J.
SCHAFER, J.
CONCUR.


APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ANGELA M. KILLE, Attorney at Law, for Father of F.V.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.