[Cite as *In re T.R.*, 2024-Ohio-3092.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: T.R.
    M.M.

C.A. Nos.    30967
                30968

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 23 02 0096
              DN 23 02 0097

DECISION AND JOURNAL ENTRY

Dated: August 14, 2024

HENSAL, Judge.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed two of her children in the legal custody of their respective fathers. This Court affirms.

I.

{¶2} Mother is the biological mother of four children. The two at issue in this appeal are T.R., born September 28, 2011, and M.M., born February 6, 2015. Her other two children are A.J. and T.G. who were 15 and five years old, respectively, when these cases began in the juvenile court. This Court will discuss facts regarding A.J. and T.G. to the extent they are relevant to the cases involving T.R. and M.M. Father R. is the biological father of T.R., and Father M. is the biological father of M.M.

{¶3} Mother was the legal custodian of the children prior to the involvement of Summit County Children Services Board ("CSB" or "the agency"), although Father R. and Father M. had life-long relationships with their children. At some point, Mother and the children moved to North Carolina. She returned to Ohio with the children in November 2022. While Mother, A.J., and T.G. stayed with friends, T.R. and M.M. went to live with their respective fathers upon returning to Ohio.

{¶4} At the end of January 2023, CSB became aware of a video showing Mother and A.J. involved in a physical altercation in a car while the other children were present. The agency implemented a safety plan whereby T.R. would remain with Father R., M.M. would remain with Father M., and A.J. and T.G. would stay with T.G.'s paternal grandmother. After further investigation, CSB discovered that none of the children were enrolled in school. Although T.R. and M.M. had been living with their respective fathers for months, Mother had the sole authority to enroll the children in school and she would not cooperate with the fathers to do so. In addition, the agency was concerned that Mother had mental health issues based on her argumentative and combative behaviors and inability to provide logical answers during the agency-sponsored team decision meeting. In early February 2023, CSB filed complaints, alleging that A.J. was abused, neglected, and dependent; and that T.R., M.M., and T.G. were neglected and dependent children.

{¶5} Mother and the two fathers appeared for the shelter care hearing, where all three stipulated to a finding of probable cause for the children's removal from Mother. The parents further agreed that T.R. and M.M. would be placed in the emergency temporary custody of their respective fathers under the protective supervision of CSB.

{¶6} Mother, Father R., and Father M. waived their rights to an adjudicatory hearing and stipulated that T.R. and M.M. were neglected and dependent, and that CSB had used reasonable

efforts to prevent the removal of the children from Mother's care. Thereafter, both fathers moved for legal custody of their respective child.

{¶7} Mother and Father M. waived their rights to a dispositional hearing and stipulated to M.M.'s placement in Father M.'s temporary custody under CSB's protective supervision, weekly supervised visits for Mother, adoption of the agency's case plan, and a finding of reasonable efforts. Although T.R.'s dispositional hearing was contested, Mother agreed with CSB's request to place that child in Father R.'s temporary custody under the agency's protective supervision. The magistrate who conducted the hearing further adopted the case plan as an order, granted Mother weekly supervised visits, and found that the agency had used reasonable reunification efforts. Mother did not file objections to the magistrate's decision.

{¶8} Mother moved for the return of legal custody of the children under the agency's protective supervision. Father R. moved for legal custody of T.R., while Father M. moved for legal custody of M.M. The magistrate held a consolidated hearing on the parents' dispositional motions. Although CSB had not filed its own motions relating to the children's custody, the assistant prosecutor informed the magistrate that the agency supported both fathers' motions. At the conclusion of the hearing, the magistrate denied Mother's motions, granted Father R.'s and Father M.'s motions for legal custody, terminated CSB's protective supervision, granted Mother weekly visitation with the children in the fathers' discretion, and found that the agency had used reasonable reunification efforts.

{¶9} Mother timely objected to the magistrate's decision. She argued that the awards of legal custody to the fathers were not supported by the evidence because she had substantially complied with her case plan objectives, and that CSB had not used reasonable efforts to reunify the children with her. CSB responded in opposition to Mother's objections.

**{¶10}** The juvenile court overruled Mother's objections. The trial court reiterated the orders awarding legal custody of the children to their respective fathers, terminating CSB's protective supervision, and granting Mother visitations in the fathers' discretion; and the finding that the agency had used reasonable reunification efforts. Mother timely appealed and raises two assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S DECISION TO GRANT LEGAL CUSTODY TO THE FATHERS WAS NOT SUPPORTED BY THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶11}** Mother argues that the juvenile court's judgments awarding legal custody of the children to their respective fathers is against the manifest weight of the evidence. This Court disagrees.

**{¶12}** It is well settled:

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

**{¶13}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*,

2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶14} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enunciated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.). Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.).

{¶15} In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶16} T.R. was 11 years old and M.M. was eight years old at the time of the dispositional hearing. Both children had been in Mother's legal custody their whole lives, although Mother

agreed that Father R. and Father M. played active roles in the children's lives. Historically, the parents cooperated regarding visitation. While the record does not disclose why Mother moved with the children to North Carolina for three years, Mother testified that she returned to Ohio in part because of the fathers' insistence. She hoped to have help raising the children, and she in fact had T.R. and M.M. live with their respective fathers upon their return to Ohio. While the children lived with their fathers, both Father R. and Father M. ensured that Mother had the opportunity to visit weekly with the children.

{¶17} T.R. has acclimated well to Father R.'s home where he shares a bedroom with another half-brother. Father R.'s girlfriend also lives with them. T.R. has a strong bond with his father and half-brother. He gets along with his father's girlfriend. The caseworker and guardian ad litem both testified that Father R.'s home is safe and appropriate and that all the child's needs are being met there. T.R. consistently told the caseworker and guardian ad litem that he wants to remain in Father R.'s home.

{¶18} T.R. was initially hesitant about visiting with Mother because he claimed that Mother often yelled at him and had been "physical with him" in the past. Eventually he agreed to visits, but after a recent incident during which he and M.M. had to pull Mother and A.J. apart during an altercation at the visitation center, T.R. reported that he no longer wanted to visit with Mother. The caseworker testified that T.R. told her he did not want to go home with Mother "for safety reasons."

{¶19} M.M. was doing well with Father M. in the home they shared with the child's paternal grandmother. The caseworker and guardian ad litem testified that the child is happy and comfortable in that home. While the caseworker testified that M.M. "indicated that she wants to remain in [Father M.'s] home[,]" the guardian ad litem testified that the child would like "equal

time with mother and father." The guardian ad litem added that M.M. loves both parents very much.

{¶20} Neither the caseworker nor the guardian ad litem identified any concerns regarding Mother's interactions with T.R. and M.M. during visits. The guardian ad litem noted, however, that Mother is "sharper" with T.R. than with M.M. and T.G. Both the caseworker and guardian ad litem were concerned that the three younger children witnessed two physical altercations in the past month between Mother and A.J. during visitation. On both occasions, the agency had to call security to remove Mother. Both A.J. and Mother were arrested after the second incident.

{¶21} Both children were enrolled in school as of February 2023, with CSB's intervention, as Mother had earlier refused to cooperate in the enrollment process. Mother testified that she had not previously enrolled the children in school because she was not sure when she returned to Ohio in November 2022, whether she would remain here. T.R. and M.M. are doing well in school and are involved in activities. T.R. is excited to play on a local football team. M.M. is slightly behind in reading, so Father M. has enlisted family members to tutor her.

{¶22} Although these cases had only been pending for just over six months at the time of the hearing, T.R. and M.M. experienced instability during that time that impacted their education and other aspects of their lives and underscored their need for permanence. Father R. and Father M. were each willing and able to provide permanent homes for their children. The caseworker and guardian ad litem both testified that the environments in the fathers' homes were safe, secure, supportive, and appropriate.

{¶23} The dissent takes issue with the fathers' decisions not to testify in support of their respective motions. While the affirmation of their desires to provide permanent homes for the children would have been appropriate, the testimony of the caseworker and guardian ad litem

adequately allowed Father R. and Father M. to meet their requisite burdens of proving that awards of legal custody to the fathers would meet the best interest of the children. Had Mother believed that the fathers were not sincere in their desires to provide permanent homes for the children or that they were unable to do so, she could have called the fathers as on cross-examination. She declined to do so.

{¶24} In lieu of arguing that Father R. and Father M. were not able to provide the necessary safety and stability for the children, Mother argues that a return of legal custody to her was in the children's best interest because she had substantially complied with her case plan objectives. This Court has repeatedly held that, although case plan compliance is relevant to the best interest of the child determination, it is not dispositive. *See In re J.W.*, 2019-Ohio-210, ¶ 15 (9th Dist.).

{¶25} Moreover, the case plan required Mother to demonstrate that she could meet the children's basic needs and to obtain a mental health assessment and follow all recommendations. Mother obtained both housing and employment during the case. However, she did not have furniture for the children when the guardian ad litem last visited Mother's home. Moreover, the caseworker expressed concerns regarding whether Mother could provide a healthy environment for the children in her home because she had never progressed beyond the need for supervised visits and, accordingly, had not demonstrated the ability to appropriately parent without oversight.

{¶26} As to Mother's mental health objective, she obtained the required assessment. The assessor diagnosed her with adjustment disorder and referred her to counseling. She engaged in five counseling sessions, including one during the month the hearing occurred. Mother failed to attend any counseling sessions during the prior three-month period, however. Instead, she testified that she engaged in "[s]elf-counseling." Because Mother remained argumentative and combative,

and because she continued to disregard the agency's rules relating to visitation and other interactions with the children, the caseworker asked Mother to obtain a parenting evaluation in hopes of further identifying areas of concern and developing a plan to address those concerns. Mother did not agree that a parenting evaluation was necessary and did not pursue one.

{¶27} Both the caseworker and guardian ad litem testified that Mother had not addressed the main issue that led to the children's removal, specifically, the inability to manage her emotions and refrain from physically violent interactions with A.J., particularly in the presence of the younger children. Even though Mother testified that she independently sought out and participated in an online anger management class, her two recent incidents at visitation involving altercations with A.J. indicated that she had not assimilated those lessons. Moreover, both the caseworker and guardian ad litem were concerned that, although Mother was engaging in counseling, she had not been forthright with her counselor about the issues and circumstances underlying the recommendation for her participation in mental health services. Throughout the cases, Mother consistently failed to take accountability for her role in the agency's involvement and the children's removal from her home. For example, she blamed A.J. for their contentious and physically violent interactions, referring to that child as a "[r]ebellious adolescent teen." Accordingly, although Mother had obtained a mental health assessment as required and began to engage in counseling, both the caseworker and guardian ad litem testified that her refusal to take responsibility for her role in the ongoing conflicts with some of the children indicated a need for Mother's participation in additional resources to help her work on interpersonal relationships.

{¶28} The guardian ad litem opined that it was in the best interest of T.R. and M.M. that the juvenile court award legal custody to their respective fathers. She added that a return of the

children to Mother's legal custody would not be in their best interest because Mother "still has some work to do on managing her emotions and handling conflicts with the kids."

{¶29} Based on a thorough review of the record, this Court concludes that this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by granting legal custody of T.R. and M.M. to Father R. and Father M., respectively. We note that the juvenile court was not limited to the custodial options requested by the motions before it. As the Ohio Supreme Court recently emphasized, "Juvenile courts are afforded broad discretion in fashioning a disposition following an adjudication of a child as being abused, neglected, or dependent, because the courts are charged with protecting the best interests of children." *In re R.G.M.*, Slip Opinion 2024-Ohio-2737, ¶ 16, citing R.C. 2151.353(A). Had the preponderance of the evidence not demonstrated that any of the parents was appropriate at the time of the hearing to assume legal custody, the trial court would have been required to deny all pending motions. At that time, the children would have continued by operation of law in the temporary custody of Father R. and Father M., while the parents continued to work on their case plan objectives in pursuit of reunification. The parties would have subsequently had the opportunity to file new or renewed dispositional motions. In these cases, however, even in the absence of testimony by Father R. and Father M., the evidence as set forth above demonstrated that the best interest of the children would be met by granting legal custody of the children to the respective fathers and ending CSB's continued involvement in the lives of these families.

{¶30} The children are safe and comfortable in their fathers' homes where all their needs are met. The fathers encourage and facilitate the children's visitation with Mother. T.R. is adamant that he wishes to live with Father R., while M.M. is also content to remain with Father M., although she wishes to spend time with Mother. The guardian ad litem opined that it is in the

children's best interest to place them in the legal custody of their respective fathers. Mother moved with the children from a home in North Carolina in November 2022, dispersed them to separate homes, and failed to facilitate their enrollment in school for several months, disrupting their education and stability. Both T.R. and M.M. have regained safety and stability in their fathers' homes. Under these circumstances, Father R. and Father M. established by a preponderance of the evidence that it is in the best interest of the children that they be placed in their own father's legal custody. As the juvenile court's judgment is not against the manifest weight of the evidence, Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

> THE TRIAL COURT ERRED BY FINDING THE AGENCY USED REASONABLE EFFORTS TO REUNIFY APPELLANT MOTHER WITH HER MINOR CHILDREN.

{¶31} Mother argues that CSB failed to use reasonable efforts to facilitate her reunification with the children. This Court disagrees.

{¶32} Section 2151.419(A)(1) requires the agency to make "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." Mother does not dispute that CSB created a case plan, made a referral to a service provider for her to obtain a mental health assessment, remained in contact with her throughout the cases, and facilitated her visitation with the children. The crux of her argument is that the agency "failed to give [her] adequate time to address any further concerns." The dissent echoes Mother's concern about the short period of time she had to work toward reunification with the children.

{¶33} The length of time that these types of cases pend is an important consideration for the juvenile court. Based on the 1997 passage of the Adoption and Safe Families Act, states were

required to establish "shorter time frames for permanency hearings, thereby limiting the time that parents could work toward reunification, so that children would not languish in the [child welfare] system for extended periods of time." *In re K.G.*, 2004-Ohio-1421, ¶ 16 (9th Dist.), citing Moye and Rinker, *It's a Hard Knock Life: Does the Adoption and Safe Families Act of 1997 Adequately Address Problems in the Child Welfare System?*, 39 Harv. J. on Legis. 375 (2002). When the legislature enacted Am.Sub.H.B. 484 in March 1999, in response to the Adoption and Safe Families Act, it sought to "balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 2004-Ohio-6411, ¶ 22, citing *In re K.G.* at ¶ 19. While those changes significantly impacted parents facing the prospect of the termination of their parental rights, the law also effected case management pursuing less restrictive custodial dispositions. In a dependency action culminating in an award of legal custody of the children to their father and denying the mother additional time to work toward reunification, this Court concluded that "[t]he critical determination is the best interest of the children, and the legislature has determined that timely permanence is a key factor in that regard." *In re E.C.*, 2022-Ohio-1223, ¶ 25 (9th Dist.).

{¶34} In this case, while Mother might have eventually successfully completed her case plan objectives and demonstrated the ability to provide a safe, stable, and appropriate home for T.R. and M.M., she continued to struggle with managing her emotions and physical aggressions when relating to her children. On the other hand, Mother herself recognized that Father R. and Father M. were capable of providing appropriate care for the children, as she placed them in their respective father's home when she returned to Ohio. CSB added each father to the case plan, and each demonstrated his ability to provide a long-term healthy, safe, stable, and supportive environment for the children, while ensuring that they maintain a relationship with Mother.

{¶35}  Mother implies in her brief that the only valid reunification efforts in these cases would have been those aimed at returning the children to her home. However, this Court has recognized that

> there is no requirement under the law to delay a child's reunification with one parent merely to allow the other parent time to address concerns which preclude the safe return of the child to that parent.  In other words, the law does not prioritize one parent's parental rights over another's in these types of cases.

*In re E.C.* at ¶ 25.  Moreover, "'the overriding purpose of the case plan is to allow the agency to assist the parents in remedying the conditions underlying a child's removal so that the child can be returned safely to *one or both* parents' custody.'" *In re M.B.*, 2023-Ohio-1804, ¶ 33 (9th Dist.), quoting *In re K.J.*, 2021-Ohio-4413, ¶ 18 (9th Dist.).

{¶36}  In this case, the juvenile court found, and we affirmed above, that Father R. and Father M. demonstrated their abilities to provide safe, stable, and appropriate homes for the children.  Accordingly, "this Court concludes that the juvenile court acted within its statutory authority and restored stability for the children by resolving the issue of custody in their best interest." *See In re E.C.* at  ¶ 25.  The agency's case plan and efforts were designed to assist Mother in remedying the concerns that led to the children's removal.  CSB was not required, however, to focus its use of reasonable efforts on reunifying the children with Mother to the exclusion of the fathers.  Mother's second assignment of error is overruled.

{¶37}  This Court emphasizes that the juvenile court's judgment does not terminate Mother's parental rights.  Mother maintains her residual parental rights and responsibilities. *In re C.R.*, 2006-Ohio-1191, ¶ 17, citing current R.C. 2151.011(B)(50).  Moreover, although legal custody is intended to be a permanent disposition, Mother may seek to modify or terminate the legal custody judgments should a change in the circumstances of the children or the fathers occur and the custodial modification becomes necessary to serve the best interest of the children. *In re*

*R.G.M.* at ¶ 17; R.C. 2151.42(B).  Should those circumstances arise, it would behoove Mother to continue working to remedy the conditions that led to the removal of the children from her home.

III.

{¶38}  Mother's assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
CONCURS.

FLAGG LANZINGER, J.
<u>DISSENTING.</u>

**{¶39}** I respectfully dissent. I would conclude that the juvenile court's award of legal custody of the children to their respective fathers at this early stage of their cases is against the manifest weight of the evidence.

**{¶40}** Mother argues that the juvenile court's awards of legal custody of T.R. to Father R. and legal custody of M.M. to Father M., in lieu of returning the children to her legal custody with or without protective supervision by CSB, is contrary to the best interest of the children. I agree with Mother that neither father met his burden of proving by a preponderance of the evidence that terminating the agency's involvement and granting legal custody to the fathers was appropriate at this time.

**{¶41}** At the time of the hearing the cases had been open for six months, while the case plan had only been in effect for three months. Mother was required to obtain a mental health assessment and follow its recommendations, and demonstrate the ability to provide for the children's basic needs. During those few months, Mother obtained housing and employment, completed her mental health assessment, and began counseling. She testified that she also participated in anger management and parenting classes beyond what the case plan required. Mother explained any gap in her counseling sessions was due to her assigned counselor leaving Portage Path and that agency not having another counselor immediately available. Shortly before the hearing, CSB recommended to Mother that she complete a parenting assessment, but the agency had not amended the case plan to add that objective. Accordingly, in the brief time available to Mother to work towards reunification, she took advantage of services and had made significant progress.

{¶42} As to Father R. and Father M., who had never been legal custodians of their children, CSB asked only that they demonstrate the ability to meet the children's basic needs. This was even though both fathers stipulated to the allegations in the complaints involving T.R. and M.M. that both fathers "do have a criminal history related to drugs[,]" although no convictions since 2017. Moreover, both fathers admitted to the agency intake caseworker that they regularly use THC. Nevertheless, the agency did not create case plan objectives for either father requiring substance abuse assessments or parenting evaluations.

{¶43} The caseworker testified without elaborating that Father R. met his sole case plan objective because he had housing and a job. While the guardian ad litem reported that Father R.'s home was appropriate, she mentioned that Father R.'s girlfriend and another child live in the house. There was no evidence that CSB had investigated the current status of Father R.'s girlfriend or their relationship.

{¶44} The caseworker further testified that Father M. met his sole case plan objective because, while he was not employed, he lived with his mother who provided financial support for the family. The caseworker emphasized that Father M. is able to meet M.M.'s basic needs through family support. However, there was no evidence of Father M.'s ability to independently provide a safe and stable home for the child.

{¶45} As I have written before in similar cases, I remain troubled that CSB initiates dependency/neglect/abuse cases but then fails to file a final dispositional motion. Here, not only had the agency not filed any motions, but it was also seemingly not aware of all pending motions and had not taken a thoughtful position as to them. While the assistant prosecutor asserted at the beginning of the hearing that CSB supported Father R.'s motion for legal custody, he requested that the juvenile court maintain the status quo as to M.M., which he asserted was placement in the

temporary custody of CSB. M.M. was not in the agency's temporary custody, however. After Father M.'s attorney confirmed that CSB did not have any pending motions, he informed the assistant prosecutor that Father M. had moved for legal custody early in the case. The assistant prosecutor then responded, "Okay. The agency is in agreement with legal custody of [M.M.] to [Father M.]." I am dismayed by CSB's hands-off approach and complacency in rushing to judgment when so many unanswered questions relating to the children's best interest and the propriety of parents who previously had limited involvement with their children remain.

{¶46} Finally, it astounds me that parents, here, Father R. and Father M., who before these cases had very limited involvement with the day-to-day care of their children, did not bother to testify in support of their respective motions for legal custody. Neither did either father call the other adults in their homes as witnesses who might have testified about their home environments and relationships with the children. This Court has recognized that "'[w]hen considering the parties' motions for legal custody, the trial court was required to hold each moving party to his [ ] respective burden of proof.'" *In re R.S.*, 2023-Ohio-2224, ¶ 46 (9th Dist.), quoting *In re A.W.*, 2021-Ohio-2975, ¶ 17 (9th Dist.). By failing to testify or elicit evidence supporting the fathers' abilities to parent and provide long term stability and safety for the children, I would conclude that Father R. and Father M. did not meet their respective burdens of proving by a preponderance of the evidence that legal custody to them at this early point in the cases is in the children's best interest.

{¶47} As Father R. and Father M. failed to meet their burdens of proof in prosecuting their respective motions for legal custody, I would conclude that the juvenile court's judgments awarding legal custody to each father were premature. Accordingly, I believe that the juvenile

court's judgments are against the manifest weight of the evidence. I would sustain Mother's first assignment of error, reverse the trial court's judgments, and remand for further proceedings.

APPEARANCES:

PAUL M. GRANT, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and MARRETT W. HANNA, Assistant Prosecuting Attorney, for Appellee.

SHUBHRA AGARWAL, Attorney at Law, for Appellee.

DAVID M. LOWRY, Attorney at Law, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.