[Cite as *In re Q.N.*, 2025-Ohio-3258.]

STATE OF OHIO )  IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

IN RE: Q.N.  C.A. Nos.  31375
        E.K.  31376

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.  DN 24 05 0350
          DN 24 05 0351

DECISION AND JOURNAL ENTRY

Dated: September 10, 2025

HENSAL, Judge.

{¶1} Appellant, D.K. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her two minor children in the legal custody of their respective fathers. This Court affirms.

I.

{¶2} Mother is the biological mother of Q.N., born January 29, 2018; and E.K., born December 7, 2015. Father N. is the biological father of Q.N. and Father B. is the father of E.K. An older half sibling of these children was also involved in the trial court proceedings but is not a party to this appeal.

{¶3} At the time this case began, the children resided with Mother in Summit County. They had established and ongoing relationships with their respective fathers. Father B. also lived

in Summit County and E.K. regularly visited him. Father N. lived farther away in Columbus, but Q.N. had spent every other weekend and summers with him.

{¶4} CSB first received a referral about this family because Q.N. had excessive school absences and, when he came to school, he often was not clean, and the school was concerned that he was living in an unsafe and unsanitary home without electricity. CSB made an appointment to meet with Mother but, on the date scheduled for the meeting, the family was involved in an automobile collision because Mother fell asleep while driving.

{¶5} A CSB intake caseworker met with Mother the following day and observed the home to be filthy and without electricity. Mother explained that the children missed school because she often stayed up late at night and overslept in the morning. The children reported that Mother slept a lot, and that she often left them at home alone. Mother stated that she would leave Q.N. and E.K., then six and eight years old, in the care of their ten-year-old sister. Mother believed that the ten-year-old was an appropriate caregiver for her younger siblings.

{¶6} Mother further admitted to CSB that she regularly used crack cocaine and that she had struggled with depression after the death of another child three years earlier. Mother admitted experiencing suicidal ideations, but she was not then involved in any mental health treatment. Mother later submitted an oral swab that tested positive for cocaine.

{¶7} On May 24, 2024, Summit County Children Services Board ("CSB") filed complaints to allege that Q.N. and E.K. were neglected and dependent children because of Mother's ongoing substance abuse, untreated mental illness, and her failure to properly supervise or meet the basic needs of her children. By agreement of the parties, the trial court adjudicated the children dependent as alleged in the complaint. The parties also agreed to the trial court placing

Q.N. and E.K. in the temporary custody of their respective fathers, under an order of protective supervision by CSB. The trial court also adopted the case plan as an order of the court.

{¶8} Mother participated in the preparation of the case plan and agreed to its requirements. As CSB had alleged in its complaint, it had no concerns about the parenting abilities of Father B. and Father N. Each father had stable employment and housing, and the agency had no reason to suspect that either of them struggled with untreated mental illness or substance abuse. Consequently, the case plan included no requirements for Father B. and the only requirement for Father N. was for him to establish paternity of Q.N. Father N. established paternity through DNA testing.

{¶9} The case plan included several specific goals for Mother that focused on her substance abuse, untreated mental illnesses, and other lack of stability in her life. Mother was required to complete substance abuse and mental health assessments and engage in recommended treatment; obtain and maintain stable income and housing; and otherwise demonstrate that she could meet the basic needs of the children. During the next several months, Mother continued to struggle with cocaine abuse and failed to complete two different drug treatment programs.

{¶10} Father B. filed a motion to have E.K. placed in his legal custody and CSB later moved for Q.N. to be placed in the legal custody of Father N. At the legal custody hearing, CSB presented the testimony of the ongoing caseworker, each father testified on his own behalf, and the guardian ad litem testified in support of legal custody to the fathers.

{¶11} Mother filed no motion on her own behalf but informed the trial court that she was opposed to the motions for legal custody. Implicitly, she sought to continue the children in the temporary custody of the fathers until the one-year sunset date so she could have more time to work on the case plan. Mother did not testify or present any evidence on her own behalf, however.

In fact, she did not cross-examine Father N. or Father B. when they testified. Following the hearing, the trial court placed Q.N. in the legal custody of Father N. and E.K. in the legal custody of Father B. and terminated the orders of protective supervision.

{¶12} Mother filed objections to the magistrate's decision pertaining to each child, which were overruled by the trial court. The trial court placed Q.N. in the legal custody of Father N. and E.K. in the legal custody of Father B., and terminated the order of protective supervision by CSB. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

> THE TRIAL COURT'S DECISION TO GRANT LEGAL CUSTODY TO THE FATHERS WAS NOT SUPPORTED BY THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother's sole assignment of error is that the trial court's legal custody decision was not supported by the evidence presented at the hearing. An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re A.M.*, 2025-Ohio-2139, ¶ 9 (9th Dist.). Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶15} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The Ohio Revised Code does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). The juvenile court is guided by the best interest factors enumerated in Section 2151.414(D) of the Revised Code relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶16} Those best interest factors include the interaction and interrelationships of the children, the children's wishes, the custodial history of the children, their need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). The juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the children's adjustment to their environment; the mental and physical health of all persons involved; and the proposed custodian's history of honoring companionship orders. R.C. 3109.04(F)(1)(d), (e), (f).

{¶17} Mother does not argue that she should have received legal custody rather than the children's fathers. Instead, she asserts that the trial court should have given her more time to work on the case plan. Mother makes no argument under the best interest factors but instead asserts that she had complied with the case plan, so she should have been given more time to be reunited with her children. "[A]lthough case plan compliance is relevant to the best interest of the child determination, it is not dispositive." *In re T.R.*, 2024-Ohio-3092, ¶ 24 (9th Dist.), citing *In re J.W.*, 2019-Ohio-210, ¶ 15 (9th Dist.). Moreover, the record demonstrates that Mother had begun to comply with the requirements of the case plan, but she was not yet prepared to provide the children with a safe and stable home. At the time of the hearing, Mother had recently gotten a job, but she still had not obtained housing. She was regularly engaged in mental health treatment and had tested negative for drugs for the past two months, but she had not yet completed a substance abuse treatment program. She began an intensive outpatient treatment program several months before the hearing but left before completing the program. Mother tested positive for cocaine after leaving the first program and then was admitted into a residential treatment program. She left that program after three weeks. By the time of the hearing, Mother had started another intensive outpatient treatment program but was still working her way through that program.

{¶18} CSB expected Mother to complete a drug treatment program and demonstrate a sustained period of sobriety and stability before it would contemplate returning the children to her home. Moreover, she would need to have stable income and housing. Mother wanted the trial court to give her more time to work toward reunification, yet she failed to testify about her relationship with her children or desire to be reunited with them. Because no evidence was presented to support reunification with Mother, she has failed to demonstrate that it was in the

children's best interest to remain in temporary custody for several more months so she could have more time to work on the case plan.

{¶19} In contrast, the evidence presented at the hearing by CSB and the fathers supported the trial court's decision that it was in the children's best interest to be placed in the legal custody of their respective fathers. Beginning with the children's interaction and interrelationships with each father, the evidence was not disputed that each child had a long-standing and positive relationship with each father before this case began. They visited their fathers regularly and there had never been any concern about the children's safety and wellbeing while with their fathers.

{¶20} All parties agreed that the children would be placed with their respective fathers as soon as they were removed from Mother's custody and that they would remain placed in those homes after the dependency adjudication. The dependency adjudication and the reunification goals of the case plan focused entirely on Mother's need for mental health and substance abuse treatment and her ability to provide appropriate supervision for her children and to meet their basic needs. During this case, the children had been thriving in each father's stable home, where they had adjusted well and all their daily needs were met. The fathers had ensured that they attended school regularly and Q.N. and E.K. had made significant academic progress. The children had expressed their desires to remain in the fathers' homes, but to continue to visit with Mother. The guardian ad litem also opined that each child should be placed in the legal custody of his or her father.

{¶21} Notably, CSB had no concerns about either father's ability to provide a safe and stable home for his child, and no evidence was presented at the hearing to raise any concerns about them. Mother presented no evidence on her own behalf and did not challenge the credibility of most of the evidence presented to support legal custody to the fathers.

{¶22} Instead, Mother raises two unsubstantiated concerns on appeal: 1) that Father B. had a 2018 "gun charge" so CSB or the guardian ad litem should have, but did not, inspect his home for the presence of a firearm; and 2) Father N. unreasonably prevented Mother from having telephone or in-person contact with Q.N. Mother supports these arguments with mischaracterizations of the evidence before the trial court.

{¶23} Mother attempted to raise an issue about Father B. having a prior "gun charge" by questioning only the guardian ad litem about it, but no evidence was presented that Father B. was ever convicted of that unexplained "gun charge" several years earlier. Moreover, although Mother asserts on appeal that Father B.'s home was not inspected for the presence of a firearm, the only testimony on this issue came from the guardian ad litem, who responded to Mother's question that she did not personally inspect the home for the presence of a firearm. Mother did not question the caseworker or Father B. about the extent to which CSB inspected the safety of his home before approving him for placement of E.K. Mother has failed to demonstrate that Father B.'s home was not adequately assessed for safety prior to the trial court placing E.K. in that home.

{¶24} As to Mother's argument that Father N. impeded her ability to communicate with Q.N., Mother again mischaracterizes the limited evidence that was presented at the hearing. When questioned about the communication between Mother and Father N., the caseworker testified that there had been some problems, but attributed those problems to both Mother and Father N. Notably, there was no evidence that Father N. or his fiancée "blocked" Mother's phone number, as Mother asserts. Instead, the caseworker testified that each parent had changed their phone number several times, that there were sometimes "issues" with Mother's calls going through, and that Mother and Father N. were not always prompt in returning the other parent's calls. She

emphasized, however, that the parties understood the importance of Mother having ongoing visits and communication with Q.N. and that the siblings should also visit regularly.

{¶25} The caseworker further testified that Mother and Father N. had agreed at the beginning of this case that Mother would have visits with Q.N. every other week and the maternal grandparents assisted Mother with transportation. She further testified that, for no specified reason, Mother had made it to only three face-to-face visits during this case. The caseworker did not blame Father N. for the lack of contact. Further, Mother was in a residential drug treatment program during part of this case, which would have prevented her from visiting either child during that period. Father N. testified at the hearing that he would facilitate visitation between Mother and Q.N. every other week. Mother did not cross-examine him to challenge any of his testimony.

{¶26} Mother has failed to demonstrate that the trial court lost its way by concluding that legal custody of Q.N. to Father N. and legal custody of E.K. to Father B. was in each child's best interest. Insofar as she asserts that it would cause the children no harm to delay ruling on the legal custody motions so she would have more time to work on the case plan, that is not the legal standard to be applied in this case. Mother implicitly advocated for a preservation of the status quo, but she presented no evidence at the hearing to support her implicit argument that a delay in achieving permanency for the children was in their best interest. Because Mother has failed to demonstrate that the trial court's judgment was against the manifest weight of the evidence, her assignment of error is overruled.

III.

{¶27} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

STEPHEN M. GRACHANIN, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AARON B. CAMPBELL, Assistant Prosecuting Attorney, for Appellee.

RONALD GATTS, Attorney at Law, for Appellee.

LAWRENCE DELINO, Attorney at Law, for Appellee.