[Cite as *In re A.L.*, 2017-Ohio-7689.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.L.

C.A. No.     28400

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 14-10-0671

DECISION AND JOURNAL ENTRY

Dated: September 20, 2017

CARR, Judge.

{¶1}    Appellant, Thomas A. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed his minor child in the legal custody of a nonrelative.  This Court affirms in part and reverses in part.

I.

{¶2}    Father is the biological father of A.L., born September 25, 2009.  The mother of A.L. ("Mother") has been incarcerated throughout these proceedings and did not appeal from the trial court's judgment.  A.L. has two half-siblings, who were involved in the trial court proceedings, but are not parties to this appeal.

{¶3}    On October 16, 2014, Police responded to a report of domestic violence at the home where A.L. lived with Mother, A.L.'s two half-siblings, and the father of the half-siblings.  While the three children were in bed, Mother had stabbed the father of the half-siblings, who

later died. Mother was arrested and taken into custody. No relatives could be located at that time to care for the children, so the police took them into custody pursuant to Juv.R. 6.

{¶4} A.L. was later adjudicated a dependent child and Summit County Children Services Board ("CSB") was awarded temporary custody of her. A.L. was placed with the half-siblings in the home of Ms. H., an aunt of the half-siblings' late father. All three siblings continued to reside with Ms. H. throughout these proceedings.

{¶5} Because Mother remained incarcerated throughout these proceedings and was eventually convicted of involuntary manslaughter, reunification under the case plan focused on Father. When this case began, however, Father's paternity had not been established and he had not been the primary caretaker for A.L. Father also lacked stable housing and had a history of drug use and convictions. Father was accepted into the juvenile court's Family Reunification through Recovery Court (FRRC), a specialized docket to provide him with intensive assistance to address the substance abuse component of the case plan.

{¶6} Although Father missed a few scheduled court appearances and drug screens, he otherwise complied with the requirements of the FRRC program and consistently tested negative for drugs. Father progressed through the FRRC program and also complied with most other aspects of the case plan.

{¶7} Approximately 10 months after A.L. and her half-siblings were placed in the home of Ms. H, the guardian ad litem moved the trial court to amend the case plan to require that the three children undergo a bonding assessment with a qualified mental health professional. He asserted that, although A.L.'s counselor had recommended that a bonding assessment be performed, CSB had not arranged for an assessment. The guardian ad litem opined that the assessment would be "of extraordinary value" in determining the best interest of the children at

the final dispositional hearing. He requested that CSB be ordered to arrange for a bonding assessment through the agency where A.L. was already receiving counseling.

{¶8} CSB filed a brief in opposition to requiring a bonding assessment, asserting that it was not necessary because all potential custodians understood that the children were bonded and were committed to maintaining the sibling bond. The agency also asserted that it should not be required to pay for the assessment. Without further explanation on the record, the trial court later ordered that the three siblings undergo a bonding assessment, that CSB facilitate the assessment, and that Ms. H. pay for the assessment.

{¶9} Father later moved for legal custody of A.L. and Ms. H. alternatively moved to have A.L. and her two half-siblings placed in her legal custody. CSB supported Father's motion for legal custody, but also requested that A.L. be transitioned into Father's home, with a period of protective supervision by the agency. The guardian ad litem supported the motion of Ms. H. because A.L. had been living in her home for nearly one year, was closely bonded to her half-siblings and Ms. H., and Ms. H. had demonstrated the ability to meet the ongoing needs of all three siblings.

{¶10} The matter proceeded to a final dispositional hearing before a magistrate. At the commencement of the hearing, the parties agreed that the two half-siblings should be placed in the legal custody of Ms. H., their paternal great-aunt. The hearing proceeded on the competing motions for legal custody of A.L. The magistrate decided that A.L. should be placed in the legal custody of Father under an order of protective supervision by CSB, reasoning that Father had made substantial progress on the reunification goals of the case plan and "[t]here are no glaring deficiencies that render this biological father unable [to] perform" his role as the child's permanent caregiver.

{¶11} The guardian ad litem filed objections to the magistrate's decision, arguing among other things that the magistrate's legal custody decision was against the weight of the evidence. In essence, he asserted that the magistrate placed too much emphasis on the biological relationship between A.L. and Father, but seemed to place no weight on the relationship and significant bond that A.L. had with her half-siblings and Ms. H. The juvenile court sustained the objection of the guardian ad litem and ordered that A.L. be placed in the legal custody of Ms. H. Father appeals and raises five assignments of error.

II.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT[']S OMISSION OF A CHILD SUPPORT CALCULATION, IN THE TRIAL COURT'S ENTRY CURRENTLY UNDER APPEAL, APPEARS TO CONSTITUTE REVERSIBLE ERROR.

{¶12} This Court will address Father's second assignment of error first because it is potentially jurisdictional. Father's second assignment of error is that the trial court erred by failing to dispose of his child support obligation at the time it awarded legal custody to Ms. H. In its judgment sustaining the objection to the magistrate's decision and awarding legal custody of A.L. to Ms. H., the trial court remanded the matter to the magistrate to determine child support.

{¶13} We begin by addressing CSB's argument that, because the trial court had not yet ruled on Father's child support obligation, the legal custody judgment appealed by Father is not final and appealable. The agency relies on a decision from another appellate district that involved an appeal from an order that had not issued a final decision on either custody or child support. *See B.W. v. D.B-B.*, 6th Dist. Lucas Nos. L-10-1017, L-10-1045, L-10-1055, 2010-Ohio-1470.

{¶14} This Court has addressed this finality issue in an appeal involving analogous facts: a post-adjudication legal custody judgment under R.C. Chapter 2151, which explicitly left unresolved the issue of child support and other residual parental rights and responsibilities. *In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 11. This Court held that the legal custody judgment itself was a partial final order under App.R. 4(B)(5). *Id.* at ¶ 12. Consequently, CSB has failed to demonstrate that this Court lacks jurisdiction to hear this appeal. *Id.*

{¶15} Turning to the merits of this assigned error, Father has failed to demonstrate any error in the trial court's failure to resolve all of his residual parental rights and responsibilities in the legal custody judgment. Despite his suggestion to the contrary, the trial court did not neglect or refuse to decide the issue of child support, but simply postposed that determination for a later date. Father's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND DENIED [FATHER] DUE PROCESS OF LAW THROUGH ITS RULING ON THE OBJECTIONS TO [THE] MAGISTRATE'S DECISION VACATING HIS AWARD OF LEGAL CUSTODY TO HIS DAUGHTER, IN FAVOR OF A THIRD PARTY.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT['] S REVERSAL OF THE AWARD OF [A.L.'S] CUSTODY [TO FATHER] IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT'S REVERSAL OF THE AWARD OF [A.L.'S] CUSTODY [TO FATHER] IS BASED UPON INSUFFICIENT EVIDENCE.

{¶16} This Court will consolidate Father's first, fourth, and fifth assignments of error because they are intertwined. Father argues that the trial court's judgment denied him due process and that it was not supported by the evidence. First, he asserts that he was denied due

process when the trial court considered the opinion of the psychologist who performed the bonding assessment because she was "hand-picked" by Ms. H. and/or the guardian. To begin with, Father raised no challenges to the introduction of the expert's testimony or the bonding assessment at the legal custody hearing.

{¶17} There is also nothing in the record to support Father's argument that the psychologist was "hand-picked" by Ms. H. or the guardian ad litem. Ms. H. paid for the assessment because the trial court ordered her to do so and there is nothing in the record to demonstrate that she chose the expert. In fact, the psychologist who performed the assessment, a clinician and executive director of the agency where A.L. was already receiving counseling, testified that it was CSB that first contacted her about performing the assessment. She had been a licensed psychologist for 28 years. At the hearing, all parties stipulated to her competency to testify as an expert in child psychology. There is nothing in the record to support Father's suggestion that this experienced mental health professional was biased for or against any of the parties in this case.

{¶18} Another due process argument focuses on the fundamental right of a parent to raise his child, grounds for permanent custody, and incorrectly equates the legal custody judgment in this case to a termination of his parental rights. The juvenile court's disposition of legal custody to a nonparent is a less drastic disposition than permanent custody to a children services agency. Significantly, legal custody does not terminate parental rights but instead "leaves intact 'residual parental rights, privileges, and responsibilities.'" *In re Shepherd*, 4th Dist. Highland No. 00CA12, 2001 WL 802209, *7 (Mar. 26, 2001), quoting former R.C. 2151.011(B)(17). Ms. H. testified that she agreed to assume the role of legal custodian and

understood that Father would remain A.L.'s parent and that she would facilitate an ongoing relationship between the two.

{¶19} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *See In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. "Although there is no specific test or set of criteria set forth in the statutory scheme, courts agree that the trial court must base its decision [regarding legal custody] on the best interest of the child." *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23, citing *In re Fulton*, 12th Dist. Butler No. CA 2002-09-236, 2003-Ohio-5984, ¶ 11.

{¶20} Father also asserts that the trial court failed to consider that he had complied with the case plan. Actually, the trial court's judgment entry explicitly recognized Father's significant progress on the case plan. Although his compliance with the case plan may have been relevant to the best interest of A.L., it was not dispositive. *See*, *e.g.*, *In re K.C.*, 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶ 22, citing *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21. The primary focus of the trial court's legal custody determination was the current parenting ability of Father and Ms. H. and whether it was in the best interest of A.L. to be permanently placed in the legal custody of either of them. *In re K.C.* at ¶ 20.

{¶21} Father's remaining due process arguments will be addressed within the context of whether the trial court's best interest decision was supported by the evidence. "[T]his Court has held that the best interest test set forth in R.C. 2151.414(D), although it relates to permanent custody, 'provide[s] guidance' in legal custody determinations." *In re B.G.* at ¶ 9, quoting *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. When determining the children's best interest under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including

the interaction and interrelationships of the children, their wishes, their custodial history, and their need for permanence in their lives. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

{¶22} Although Father argues otherwise, the record reveals that the trial court considered the bond and interrelationships between A.L. and all of the significant people in her life, including Father, her two half-siblings, other relatives, and Ms. H. It was not disputed that both Father and Ms. H. loved A.L. and were willing to provide her with a stable permanent home. The trial court was in the position of choosing one legal custodian who would serve A.L.'s best interest.

{¶23} Father also insinuates that, as the magistrate did, the trial court was required to give Father preference as legal custodian because he is A.L.'s biological parent. Similarly, CSB had supported Father's motion because he had made exemplary progress on the case plan and he is the child's father.

{¶24} Courts have held that appropriate relatives should generally be given priority over nonrelatives in legal custody decisions, but "blood relationship, in and of itself, does not control the trial court's best interest determination." *In re L.H.*, 9th Dist. Summit No. 28090, 2016-Ohio-8284, ¶ 10, citing *In re J.B.S.,* 4th Dist. Scioto No. 09CA3316, 2010-Ohio-1974, at ¶ 25. The trial court's best interest decision should focus on the child's interaction and emotional bond with any potential custodian, not simply a blood relative. *In re L.H.* at ¶ 10, citing *In re J.B.S.* at ¶ 25.*Id.* at ¶ 10. Moreover, the trial court was also required to weigh A.L.'s relationship and bond with her biological half-siblings, who had been placed in the legal custody of Ms. H. *In re L.H.* at ¶ 11.

{¶25} When this case began, A.L. was residing with Mother, the half-siblings, and the father of the half-siblings. Several witnesses testified that A.L. considered her half-siblings to be her siblings and their father to be her father because she had lived with him for years and he treated her as if she were his own child. A.L. referred to Father as her other dad.

{¶26} When Mother killed the father of the half-siblings, A.L. tragically lost both of her parent figures. Although A.L. did not witness the killing, she understood that her half-siblings' father was dead and that Mother was incarcerated for killing him. A.L. had no contact with Mother throughout this case because her counselor opined that the child was not emotionally prepared to communicate with her.

{¶27} Ms. H. immediately reached out to CSB and agreed to provide a stable home for A.L. and her two half-siblings, preserving what remained of the family that A.L. had known for most of her life. The expert who performed the bonding assessment described the ongoing relationship between the three siblings as "very critical" because they had already experienced serious trauma by losing both of their parent figures. A.L. had told her that the siblings "have always been together." The expert gave examples of how the siblings emotionally supported each other and emphasized the importance of keeping the sibling group together. She opined that A.L. would experience further loss and pain if she were not able to have daily contact with her siblings. A.L.'s counselor also opined that A.L. would suffer another emotional loss if she were removed from the home of Ms. H. and separated from her siblings.

{¶28} At the time of the hearing, A.L. had been living with Ms. H., her two half-siblings, and Ms. H.'s immediate family for more than one year. No one disputed that all of her needs were being met in that home. A.L. had become assimilated into the family and perceived

Ms. H's home as her own home. Ms. H. had assured that A.L. regularly attended school and counseling and the child had made significant progress in her home.

{¶29} Father and Ms. H. had worked together to provide care for A.L. and to facilitate her ongoing relationship with other family members. Father saw A.L. regularly and his visits with her were expanded over time to long weekends. Apparently because Father's girlfriend had children in her home, A.L. and Father typically visited at the girlfriend's home. Witnesses expressed concern, however, that A.L. had not stayed at Father's actual home, nor had she met some of the people living in Father's home.

{¶30} Moreover, Father had not demonstrated an ability to provide for A.L.'s daily care. He saw her primarily on weekends and during many of those visits, A.L. actually spent her time with relatives, Father's girlfriend, or others in the home. Although Father's weekend visits did not require him to regularly get A.L. to school or counseling, Father had not made the effort to attend any school activities or conferences, nor had he responded to encouragement to participate in the bonding assessment and/or A.L.'s counseling.

{¶31} A.L.'s counselor testified that A.L. did not talk about Father during sessions or include him in pictures of her family. Based on her ten years of experience counseling children, she believed that A.L.'s failure to discuss Father reflected a lack of a strong bond between the two. The counselor invited Father to attend counseling sessions to pursue the matter further and encourage bonding between the two, but Father attended only two sessions. He agreed to continue attending sessions once a month, but he did not. A.L. continually asked the counselor when Father would return. Father asserts that he could not attend counseling sessions because of his work schedule. The counselor testified, however, that she told Father that she was willing to

reschedule appointments to accommodate his work schedule. She gave him her phone number but he did not call her.

{¶32} A.L.'s wishes about where she wanted to reside were unclear. Father points to the fact that A.L. had expressed a desire to live with Father. A.L.'s counselor testified, however, that then 6-year-old A.L. did not understand what custody meant because she spent time with several different relatives on a regular basis. Moreover, A.L. seemed to believe that if she were to live with Father, her half-siblings would live there also.

{¶33} The guardian ad litem opined that legal custody to Ms. H. was in the best interest of A.L. Although the caseworker had testified otherwise, this Court has repeatedly stressed that it is the guardian ad litem, not the caseworker, who is authorized to provide an opinion about the best interest of the child. *See, e.g.*, *In re L.P.*, 9th Dist. Summit No. 27792, 2015-Ohio-4164, ¶ 23. Contrary to Father's assertions, there is nothing in the record to demonstrate that the guardian ad litem was biased; he simply disagreed with the caseworker about the child's best interest.

{¶34} The guardian ad litem testified that A.L. is strongly bonded to her half-siblings and Ms. H. and that Ms. H's home is a "warm and loving place." He commended Ms. H. for providing stability, safety, and ongoing emotional support for A.L. at a time when she needed it most. He opined that legal custody to Ms. H. was in the best interest of A.L. because Ms. H. had proven that she can consistently meet the child's needs. While he recognized that Father and A.L. love each other, he expressed concern that Father had never been the child's primary caretaker. Moreover, unlike Ms. H., Father had failed to demonstrate a commitment to meeting the child's daily needs.

{¶35} A.L.'s custodial history during this case had included one year living in a temporary placement. She had spent most of her life before this case in the custody of parent figures who could no longer care for her. Her counselor testified that A.L. was in need of a legally secure permanent placement and that a placement that would allow her to remain with Ms. H. and her siblings would be optimal.

{¶36} Consequently, Father has failed to demonstrate that the trial court erred in concluding that legal custody to Ms. H. was in the best interest of A.L. Father's first, fourth, and fifth assignments of error are overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT[']S OMISSION OF A REASONABLE EFFORTS DETERMINATION AND WRITTEN FINDINGS OF FACT STAT[ING] THE REASONS SUPPORTING ITS "REASONABLE EFFORTS" DETERMINATIONS, IN ITS ENTRY UNDER APPEAL[,] CONSTITUTES PREJUDICIAL AND REVERSIBLE ERROR AS A MATTER OF LAW.

{¶37} Father's third assignment of error is that the trial court's judgment granting legal custody to Ms. H. failed to comply with R.C. 2151.419. Specifically, because the trial court continued the removal of A.L. from the custody of her parents, R.C. 2151.419(A)(1) required the trial court to determine whether CSB had made reasonable efforts "to eliminate the continued removal" of A.L. "or to make it possible for the child to return safely home." R.C. 2151.419(B)(1) additionally provides that, when making those required reasonable efforts findings, the court "shall issue written findings of fact setting forth the reasons supporting its determination." Specifically, it must "briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home." *Id*.

**{¶38}** Father does not argue that CSB failed to make reasonable efforts to place A.L. in his home, nor would the record support such an argument. Instead, Father confines his assigned error to the trial court's failure to make the requisite findings under R.C. 2151.419. Because the trial court failed to make the requisite reasonable efforts finding under R.C. 2151.419, Father's third assignment of error is sustained. *See In re J.G.*, 9th Dist. Wayne No. 12CA0037, 2013-Ohio-417, ¶ 36.

## III.

**{¶39}** Father's third assignment of error is sustained. His remaining assignments of error are overruled. The judgment of the trial court is reversed solely for the purpose of the trial court making reasonable efforts findings under R.C. 2151.419. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed in part and reversed in part and the cause remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part, and
the cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

RUSSELL A. BUZZELLI, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

JOSEPH M. KERNAN, Guardian ad Litem.