[Cite as *In re A.M.*, 2025-Ohio-5029.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.M.

C.A. No.     31374

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 08 0702

DECISION AND JOURNAL ENTRY

Dated: November 5, 2025

STEVENSON, Judge.

{¶1}     Appellant, A.B. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed one of her minor children in the legal custody of the child's foster parents ("Custodians").  This Court affirms.

I.

{¶2}     Mother is the biological mother of A.M., born July 9, 2016.  A.M.'s father did not consistently participate in the trial court proceedings and did not appeal from the final judgment.

{¶3}     Mother also has four other children who are not parties to this appeal, so limited facts about them are included in the record of A.M.'s case.  Summit County Children Services Board ("CSB") has been involved with Mother's children off and on for several years.  According to stipulated facts in the record, Mother has a "significant past history" with CSB dating back to 2016 "involving lack of supervision of the children[]" and Mother's untreated mental illnesses.

{¶4}     During May 2019, for reasons not explained in the record, one of Mother's younger children, J.W., was placed in the legal custody of that child's paternal grandmother. Approximately one year later, CSB received a referral that Mother had repeatedly left the three young children who were then in her custody (four-year-old A.M., two-year-old K.C., and four-month-old A.D.) home alone without adult supervision. CSB later filed complaints to allege that A.M., K.C., and A.D. were neglected and dependent. In addition to Mother's failure to provide them with appropriate supervision, Mother had recently been hospitalized for psychiatric treatment; had been previously diagnosed with bipolar disorder, but was more recently diagnosed with depression, conduct disorder, anxiety, and PTSD; and had just begun mental health treatment.

{¶5}     Mother later stipulated to the facts alleged in the 2020 complaint and the trial court adjudicated the three children dependent under R.C. 2151.04(B) and (C). The trial court allowed the children to remain in Mother's custody under an order of protective supervision by CSB. Mother apparently complied with the reunification requirements of the case plan, so the trial court terminated protective supervision on May 27, 2021.

{¶6}     During April 2022, a criminal court convicted Mother of receiving stolen property and operating a vehicle while impaired and placed her on community control. For the next few months, CSB worked with Mother on a voluntary basis because she was struggling to meet the financial needs of her family. During Mother's voluntary involvement with CSB, the caseworker discovered that Mother was no longer involved in mental health treatment. Mother also tested positive for THC and oxycodone.

{¶7}     On August 5, 2022, CSB filed complaints to allege that A.M., K.C., and A.D. were neglected and dependent because of Mother's untreated mental illnesses and her recent use of illegal drugs. Although CSB initially sought protective supervision of the children, it later filed

an amended complaint and obtained emergency temporary custody of the three children, based on allegations that Mother had continued to test positive for oxycodone, THC, and cocaine. CSB also alleged that Mother had been exhibiting erratic behavior. By agreement of the parties, the trial court adjudicated A.M. (and presumably K.C. and A.D.) dependent under R.C. 2151.04(B), (C), and (D). The trial court later placed all three children in the temporary custody of CSB and adopted the case plan as an order of the court.

{¶8} By the February 2023 review hearing, the magistrate noted that Mother was engaging in some counseling but had not yet obtained substance abuse or mental health assessments. Mother also repeatedly tested positive for benzodiazepines and marijuana. At that time, Mother was having weekly, monitored parenting time with the children at the agency visitation center.

{¶9} By August, however, Mother was actively engaged in case planning services and was making progress toward achieving sobriety and a stable lifestyle. The trial court granted CSB's request for a first six-month extension of temporary custody to allow Mother more time to work on the case plan. Mother gave birth to her fifth child on October 11, 2023. She was then residing with a paramour who had demonstrated to CSB that he was a positive support for Mother. Mother agreed to a voluntary safety plan with CSB pertaining to the newborn child, which allowed her to maintain custody of that child. Mother continued to participate in services and test negative for drugs.

{¶10} During this one-year period, Mother made more significant progress toward reunification with A.D. and K.C. than with A.M. To begin with, Mother admittedly had a closer relationship with A.D. and K.C. and those children apparently did not exhibit any reluctance to visit Mother. A.D. and K.C. were also placed with a maternal cousin ("Cousin"), who is part of

Mother's extended family support system and assisted Mother with A.D. and K.C. throughout this case. Mother's visitation with these two children gradually progressed to monitored and then unsupervised visits in Mother's home. For unexplained reasons, Cousin was not willing or able to have A.M. placed in her home.

{¶11} Although CSB had attempted to find another suitable relative to care for A.M. and the child was briefly placed with two different relatives, those placements did not work out for the child. One of those placements disrupted because the relative was unsuitable and the other relative asked for A.M. to be removed because of behavior concerns. Consequently, during the first year of this case, A.M. moved between multiple temporary placements. CSB eventually returned A.M. to the home of Custodians, a therapeutic foster family where he had been placed for several months at the beginning of this case. After his return to Custodians' home in April 2023, A.M. remained placed in their home for the remainder of this case and adjusted well to living there.

{¶12} Mother's visits with A.D. and K.C. gradually expanded to unsupervised weekend visits in her home. By the end of the first six-month extension, Mother was making significant case plan progress and had a strong family support system to help her care for her children. Consequently, by agreement of the parties, the trial court granted CSB's motion for a second six-month extension of temporary custody of A.M. and K.C. The trial court returned A.D. to Mother's custody under an order of protective supervision.

{¶13} Regarding A.M., the trial court found that he was still struggling emotionally and was resistant to visiting Mother. A.M. was already in therapy, so his therapy time was increased to help him address his anger and inability to identify and express his emotions to others. Although Custodians reside in another county, they transported A.M. to Akron for his weekly monitored visits with Mother. Both Custodians and the caseworker tried to encourage Mother to also have

regular phone calls and Facetime visits with A.M. and to come to his sporting events and other activities with their family. Mother did not consistently attend her scheduled telephone or in-person visits with A.M., however, which caused A.M. to suffer disappointment and feelings that Mother did not care for him as much as his younger siblings. Moreover, when she did attend, Mother did not engage much with A.M. Unlike her increasing interaction with A.D. and K.C., Mother did not pursue expanded visitation with A.M. in her home or elsewhere.

{¶14} Following a hearing one month later, the trial court returned K.C. to mother's custody under an order of protective supervision. As to A.M., the court ordered that the child continue in the temporary custody of CSB. Mother explicitly agreed at the motion hearing that A.M. would remain in the agency's temporary custody.

{¶15} The guardian ad litem and CSB eventually moved for A.M. to be placed in the legal custody of Custodians. Mother alternatively moved the trial court to return A.M. to her legal custody. A hearing on the competing legal custody motions was held before a magistrate on August 22, 2024. Following the hearing, the magistrate decided that A.M. would be placed in the legal custody of Custodians. Mother filed objections, which were overruled by the trial court. The trial court placed A.M. in the legal custody of Custodians. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT'S FINDING THAT GRANTING LEGAL CUSTODY TO [CUSTODIANS] WAS IN THE BEST INTEREST OF [THE] CHILD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHERE THE RECORD WAS CLEAR THAT MOTHER HAD REMEDIED THE CONCERNS THAT LED TO REMOVAL, SUCH THAT CHILD'S SIBLINGS HAVE ALREADY BEEN RETURNED TO THE HOME; WHERE CHILD, WHO IS ONLY EIGHT, DID NOT ARTICULATE ANY PARTICULAR BASIS FOR NOT WISHING TO REUNIFY WITH [MOTHER]; AND WHERE MOTHER

AND CHILD HAD NOT BEEN ABLE TO PARTICIPATE IN FAMILY THERAPY DUE TO A WAIT LIST.

{¶16} Mother's sole assignment of error is that the trial court's legal custody judgment is against the manifest weight of the evidence. An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re A.M.*, 2025-Ohio-2139, ¶ 9 (9th Dist.). Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

{¶17} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶18} This Court begins by recognizing that Mother's fundamental right to raise A.M. is at issue in this case. We must emphasize, however, that the judgment granting legal custody to Custodians was not akin to a termination of Mother's parental rights. *In re A.L.*, 2017-Ohio-7689, ¶ 18 (9th Dist.). The juvenile court's disposition of legal custody "is a less drastic disposition than permanent custody" because Mother retains her "residual parental rights, privileges, and responsibilities." *Id.*; R.C. 2151.011(B)(21). Those include, "but [are] not necessarily limited to,

the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C. 2151.011(B)(50).

{¶19} Therefore, although A.M. was not returned to Mother's custody in this case, the trial court did not sever Mother's right to have an ongoing relationship with him, which will enable them to work on repairing their strained relationship. The caseworker testified that Custodians were very supportive of preserving the family relationship between A.M. and his biological family. Throughout this case, Custodians had facilitated Mother's visits with A.M. and encouraged her to have additional contact with A.M. Both testified that, if granted legal custody, they would continue to facilitate and encourage that ongoing family relationship.

{¶20} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The Ohio Revised Code does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶21} Those best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). The juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.).

While some factors overlap with those above, others include the children's adjustment to their environment, and the proposed custodian's history of honoring companionship orders. R.C. 3109.04(F)(1)(d), (f).

{¶22} Mother argues that she had complied with the requirements of the case plan, and her younger two children had been returned to her custody, so A.M. also should have been placed in her legal custody. "[A]lthough case plan compliance is relevant to the best interest of the child determination, it is not dispositive." *In re T.R.*, 2024-Ohio-3092, ¶ 24 (9th Dist.), citing *In re J.W.*, 2019-Ohio-210, ¶ 15 (9th Dist.).

{¶23} Moreover, although the evidence demonstrated that Mother was prepared to provide a suitable home for A.D. and K.C., her relationship with A.M. was much more complicated. Evidence about Mother's strained relationship with A.M. supported the trial court's conclusion that returning the child to Mother's home was not in A.M.'s best interest. Beginning with the interaction and interrelationships between A.M. and significant others in his life, witnesses observed that there did not appear to be a close bond between Mother and A.M. The caseworker emphasized that Mother was disengaged during visits with A.M. and that she rarely saw any affection or hugging between Mother and A.M.

{¶24} The evidence was not disputed that Mother's relationship with A.M. was not as close as it was with A.D., K.C., and her youngest child. The caseworker testified that she had observed a "strong disconnect" between Mother and A.M. Mother herself admitted that she had a stronger relationship with A.D., K.C., and the baby because A.M. had "put up a wall" and was "distant and not really open with me." She recognized that A.M. might be "afraid that if he's bonded with me, it will be broken again[.]" The caseworker expressed concern Mother did not

seem to be interested in attempting to better understand A.M.'s needs or in improving her relationship with him.

{¶25} The caseworker and Custodians repeatedly tried to encourage Mother to engage more with A.M., but she did not make those efforts. She would fail to show for some in-person visits and even scheduled telephone or Facetime calls. Everyone involved in this case understood that Mother had three younger children and that it was not easy for her to devote one-on-one attention to A.M. with the other children around. Because Mother had a strong family support system, the caseworker had encouraged Mother to leave the younger children at home with another caregiver and visit A.M. by herself now and then, but she never did. During this case, A.M. developed a strong belief that Mother did not care about him and that Mother failed to demonstrate to A.M. that she loved and cared about him.

{¶26} Mother came to A.M.'s baptism and some of his sporting events but she always left quickly after each event and did not interact much with him. A.M.'s perception that Mother cared more about his younger siblings only intensified after Mother failed to celebrate his eighth birthday, which was about six weeks before the final hearing. Mother later brought A.M. a gift to a visit that occurred after the child's birthday. Nevertheless, A.M. was aware that Mother had thrown a family birthday party for K.C.'s seventh birthday, which was six days before A.M.'s birthday. Mother did not invite A.M. to his sibling's party. Custodians explained that they would have driven A.M. to the party, and expressed disappointment that Mother excluded A.M. from the family event. Custodians often reached out to Mother, but Mother did not always respond. They were also disappointed that Mother did not call them to inquire about A.M.

{¶27} As several witnesses explained, A.M. had been through a lot of emotional turmoil during this case and throughout his life because of continual involvement of his family with CSB

because of Mother's parenting problems. He was angry and disappointed with Mother. As the caseworker explained, A.M. is older than his other siblings and remembers what his family has been through. After this case had been pending for almost two years, the guardian ad litem testified that A.M. was "done" with CSB involvement and moving back and forth between different homes.

{¶28} Mother faults CSB for her failure to build a stronger bond with A.M. because they were still on a waiting list to engage in family counseling. As explained already, Mother made minimal effort to engage in additional visits with A.M. or attempt to improve their relationship. The caseworker further explained that CSB did not request family counseling sooner because Mother was not fully engaged in case plan services and she and A.M. had not reached the point in their own counseling that they were ready for family counseling. A.M.'s counselor testified that, after one and a half years of working with A.M., the child was just starting to open up to her. A.M.'s counselor reached out to Mother periodically about A.M., but Mother had never mentioned an interest in counseling with A.M.

{¶29} On the other hand, A.M. had developed a close bond with Custodians and their entire family while he was placed in their home for a total of one and a half years. He looked to them for comfort and support and felt safe in their home. He had become particularly close to Custodians' daughter. In contrast to the lack of affection that the guardian ad litem observed between Mother and A.M., she testified that she had observed hugging and other displays of affection between A.M. and Custodians' family.

{¶30} A.M. expressed his wishes to the guardian ad litem. He had expressed a desire to be reunified with Mother at the beginning of the case but, by the time of the hearing two years later, the child consistently expressed his desire to continue living with Custodians and to visit Mother. The evidence was clear that the relationship between A.M. and Mother had only become

11

more distant during this case. A.M. expressed "fear of leaving [Custodians'] home and returning to mom." He also threatened that he would run away or harm himself if he were returned to Mother's home. The guardian ad litem opined that A.M. had become closely bonded to Custodians' family and expressed concern that another change in A.M.'s placement would be traumatic for him. She concluded that it was in the best interest of A.M. to be placed in Custodians' legal custody.

{¶31} The custodial history of A.M. is not entirely clear from the record. There was no evidence that CSB had previously removed A.M. from Mother's custody, so he apparently resided with her for the first six years of his life. During that time, however, the family had been involved with CSB off and on since A.M. was an infant.

{¶32} During this case, A.M. had been in CSB's temporary custody for over two years and needed a legally secure permanent placement. CSB had been unable to find a suitable relative who was willing and able to take placement of A.M., even on a temporary basis. A.M. had found stability with Custodians, who were meeting all his needs in a warm and loving environment. The evidence supported the trial court's conclusion that a legally secure permanent placement would be achieved by placing A.M. in the legal custody of Custodians.

{¶33} Given the evidence before the trial court, this Court cannot conclude that the trial court lost its way by finding that it was in the best interest of A.M. to be placed in the legal custody of Custodians. Mother's assignment of error is overruled.

III.

{¶34} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
SCOT STEVENSON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, P. J.
DISSENTING.

{¶35} I respectfully dissent from the majority opinion. As the majority acknowledges, Mother has a fundamental right to raise A.M. *In re C.F.*, 2007-Ohio-1104, ¶ 28 ("The right to parent one's children is a fundamental right."). By design, foster parents provide a safe, nurturing, and supportive environment for the children under their care. *See* Adm.Code 5180:2-7-09. The

government reimburses foster parents for costs associated with providing this care, including a per diem amount and reimbursements for food, clothing, and other basic necessities. *See State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 2008-Ohio-1770, ¶ 18-19. Allowing foster parents to obtain legal custody of A.M. after Mother complied with the reunification requirements defeats the stated purpose of the reunification process: to *reunify* parent and child. This result not only disincentivizes parents from meeting their reunification goals, it grants foster parents superior rights to biological parents for doing what they are obligated to do: provide a safe, supportive, and nurturing environment for the children under their care. The trial court's decision creates a dangerous precedent that threatens a parent's fundamental right to parent his or her child. I would sustain Mother's assignment of error and reverse the decision of the trial court. For these reasons, I respectfully dissent.

APPEARANCES:

ALISA BOLES, Attorney at Law, for Appellant.

JAMES K. REED, Attorney at Law, for Appellee.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.

AVIVA WILCHER, Guardian ad Litem.