[Cite as *In re D.B.*, 2026-Ohio-645.]

STATE OF OHIO   )   IN THE COURT OF APPEALS
         )ss:   NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

IN RE: D.B.         C.A. No.  31650


              APPEAL FROM JUDGMENT
              ENTERED IN THE
              COURT OF COMMON PLEAS
              COUNTY OF SUMMIT, OHIO
              CASE No.  DN 23 05 0416

DECISION AND JOURNAL ENTRY

Dated: February 25, 2026

---

   HENSAL, Judge.

  **{¶1}** Appellant, D.G. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child and placed the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

  **{¶2}** Mother is the biological mother of D.B. born February 12, 2015. The child's father ("Father") did not actively participate in the trial court proceedings or appeal from the trial court's judgment.

  **{¶3}** On May 17, 2023, CSB filed a complaint to allege that D.B. was a dependent child because of his ongoing exposure to methamphetamine, heroin, and crack cocaine use by Mother and other adults in the home. Mother admitted that she used cocaine in the past, but she denied any current use. Mother initially refused to cooperate with CSB, but later voluntarily submitted

an oral swab that tested positive for a high level of cocaine. Throughout this case, Mother continued to deny that she used cocaine, even when she tested positive. Mother's explanation for the positive tests was that other people used cocaine in her home, and she must have come in contact with the residue.

{¶4} After CSB removed D.B. from Mother's custody, Akron Children's Hospital conducted a medical assessment of the child, which included consultation with medical professionals who had previously treated him. The assessment revealed that D.B. was born prematurely at 29 weeks' gestation and had breathing problems immediately after birth and for the next several months. He also experienced ongoing problems with his vision and muscle tone. According to Mother, D.B. remained in the neonatal intensive care unit ("NICU") for six months after his birth, but she knew little about the treatment he received.

{¶5} D.B.'s NICU records are not part of the record. According to the medical assessment conducted during this case, D.B. received treatment in the NICU for developmental delays and poor muscle tone, but it is unclear when he was first diagnosed with cerebral palsy. The record does include evidence that C.B. was diagnosed with cerebral palsy while he was in Mother's custody, but that he missed many of his scheduled medical and therapy appointments. CSB was concerned that Mother had not informed the agency about D.B.'s cerebral palsy diagnosis and that she did not seem to understand the significance of his diagnosis or his need to receive consistent medical treatment and therapy.

{¶6} According to D.B.'s pediatric physiatrist, cerebral palsy is "a disorder of movement and posture of the body" that will affect D.B. for his entire life. Although D.B. experienced relatively mild symptoms of cerebral palsy, he will require ongoing monitoring and medical and therapeutic treatment. His current symptoms were "weakness and coordination challenges" in his

left arm, hand, leg, and foot. During this case, his treatment included wearing a brace on his left ankle and foot and receiving periodic Botox injections to retain flexibility in his foot muscles. The physiatrist further explained that D.B. would benefit from occupational therapy and that, over time, D.B.'s need for medical treatment and physical or occupational therapy may increase or decrease, depending on his changing symptoms. Consequently, D.B. requires a caregiver who will be attuned to the child's continually changing needs and will ensure that he consistently receives appropriate treatment.

{¶7} Mother waived her rights to adjudicatory and dispositional hearings and agreed to the trial court's order that adjudicated D.B. as a dependent child under Section 2151.04(B) and (C) of the Revised Code, and its dispositional order that placed D.B. in the temporary custody of CSB and adopted the case plan as an order of the court. Among other things, the case plan required Mother to demonstrate that she could meet the child's daily needs, including that she understood and would regularly address the specific needs of his cerebral palsy diagnosis. Mother was also required to engage in mental health and substance abuse assessments and any recommended treatment. The case plan's ultimate substance use goal was that Mother "will not abuse alcohol or illegal drugs" and "will live a sober lifestyle."

{¶8} During the first year of this case, Mother completed an outpatient drug treatment program but never admitted that she had a current substance abuse problem or that she needed treatment. Shortly after Mother completed her first treatment program, she tested positive for cocaine several times. Mother again denied that she had used the drug but stated that other adults must have used the drug in her home. Neither her counselor nor the caseworker believed Mother's explanation for her positive drug screens. The caseworker expressed further concern that, even if Mother's explanation was plausible, she was knowingly allowing illegal drug use in her home.

{¶9} Shortly before the one-year sunset date, CSB filed a motion for permanent custody of D.B. A few months later, CSB withdrew that motion and alternatively requested and received a six-month extension of temporary custody because Mother was back in drug treatment and was again testing negative for cocaine. Mother completed the second outpatient drug treatment program in July 2024, but she tested positive for cocaine several times during August and September 2024.

{¶10} Consequently, CSB filed a second motion for permanent custody of D.B. CSB later withdrew that motion, and the trial court granted the agency's request for a second extension of temporary custody because Mother had stopped using cocaine for several months. Mother continued to test negative for drugs for the remainder of the case. CSB would later learn, however, that Mother had been abusing alcohol and that she had outstanding warrants for several theft offenses.

{¶11} On May 6, 2025, CSB again moved for permanent custody of D.B. Mother alternatively requested legal custody of the child. Following the final hearing, the trial court terminated parental rights and placed D.B. in the permanent custody of CSB. Mother appeals and raises two assignments of error, which this Court will address together because they are closely related.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S FINDINGS THAT THE TERMINATION OF [MOTHER'S] PARENTAL RIGHTS WAS IN D.B.'S BEST INTEREST WERE NOT SUFFICIENTLY SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S FINDINGS THAT THE TERMINATION OF [MOTHER'S] PARENTAL RIGHTS WAS IN D.B.'S BEST INTEREST [WERE] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12} Through her two assignments of error, Mother argues that the trial court's judgment was not supported by sufficient evidence and was against the manifest weight of the evidence. Although sufficiency and weight are distinct legal concepts, this Court will review them together because they require a review of the same evidence. *See In re Z.C.*, 2023-Ohio-4703, ¶ 13.

{¶13} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶14} This Court's review under the sufficiency of the evidence standard requires us to "'examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Clear and convincing evidence is that which will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross*, at paragraph three of the syllabus.

{¶15}  In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered."  (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact."  *Id*. at ¶ 21.

{¶16}  On the first prong of the permanent custody test, the trial court found that D.B. had been in the temporary custody of CSB for more than 12 months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d).  Mother does not dispute that finding, which is supported by the record.  When CSB filed the final permanent custody motion, D.B. had been in its temporary custody for nearly 22 months.

{¶17}  Next, the trial court found that permanent custody was in the child's best interest. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in Section 2151.414(D).  *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, the child's wishes and custodial history, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply.  R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.).  None of the factors set forth in Section 2151.414(E)(7)-(11) apply in this case.

{¶18}  Mother focuses much of her best interest argument on her representation that she had "fulfilled her case plan requirements."  She recognizes that this Court has stressed that case

plan progress is not dispositive of a child's best interest. *See*, *e.g.*, *In re A.M.*, 2025-Ohio-5029, ¶ 22 (9th Dist.); *In re T.R.*, 2024-Ohio-3092, ¶ 24 (9th Dist.); *In re J.W.*, 2019-Ohio-210, ¶ 15 (9th Dist.). Moreover, the record does not support Mother's assertions that she had made significant progress on the reunification requirements of the case plan.

{¶19} To begin with, Mother mischaracterizes the substance abuse component of the case plan as a requirement that Mother merely abstain from using cocaine. In fact, as quoted above, the case plan required that Mother "will not abuse alcohol or illegal drugs" and "will live a sober lifestyle." Throughout this case, CSB had tested Mother only for certain drugs, not alcohol. During the final extension period, CSB learned from the Akron Metropolitan Regional Transit Authority ("Metro") that Mother had frequently been intoxicated at one of its stations, which caused her to be banned from all Metro stations on three separate occasions.

{¶20} Mother's first two bans were for 60-day periods. Several weeks before the final hearing, Mother was banned from Metro stations for the next six months. A Metro police officer, who was familiar with Mother from prior encounters, observed Mother that day, slumped over on a bench at the station. The officer testified at the hearing and CSB played portions of her body camera video from the incident. That evidence established that Mother was noticeably intoxicated and that she had a half-empty bottle of liquor in her purse. The officer informed Mother that she would either arrest her or send her to Metro's detox center because Mother was too intoxicated to walk home and would have "an opportunity to sleep it off" at the detox center. Mother agreed to go to the detox center because she did not want to be arrested. However, after the officer ran a computer check and discovered that Mother had an active arrest warrant, she contacted law enforcement to transport Mother to Summit County Jail.

{¶21} The officer explained that she had observed Mother under the influence at the same station on several occasions, and that she had only once seen Mother when she appeared to be sober. Mother had been so noticeably intoxicated that she was banned from the Metro station three separate times, but she continued to deny that she ever abused alcohol. Mother had completed two several-month substance abuse programs, yet she failed to admit that she had a current substance abuse problem. Given her recent and repeated incidents of public intoxication and failure to admit that she had an alcohol problem, it was reasonable for the trial court to conclude that Mother had not resolved her substance abuse problem.

{¶22} Moreover, Mother failed to demonstrate that she had the financial ability to meet the basic needs of her child. During this case, Mother committed four separate theft offenses. She committed two thefts on the same day in October 2024, by stealing clothing from one store and groceries from another. During late March and early April 2025, Mother committed two additional thefts by stealing over $100 in groceries from a grocery store and stealing a package that was delivered to someone else in her apartment building. Mother stated that she stole the groceries because she could not afford to buy them. Mother was unemployed throughout this case and was apparently unable to meet even her own basic needs with the government assistance that she received.

{¶23} Regarding D.B.'s unique medical needs, CSB remained concerned that Mother had not been forthcoming with the child's cerebral palsy diagnosis and did not know much about it. Mother was not aware that D.B. will be affected by cerebral palsy for his entire life and did not acknowledge that, as D.B.'s caregiver, she was responsible for monitoring the child's condition for changes in his coordination and muscle tone. She testified that her role was to get D.B. to his

appointments that were scheduled by each provider, but she had failed to consistently do that while D.B. was in her care.

{¶24} Under the statutory best interest factors, the trial court was required to consider the interaction between Mother and D.B. Witnesses agreed that the interaction between Mother and D.B. during this case was mostly positive. Mother attended visits regularly and her supervised visits were briefly expanded to two unsupervised visits in Mother's home. After Mother was arrested and incarcerated, CSB again required that her visits with D.B. be supervised at the agency for the remainder of the case. Consequently, Mother did not make enough progress toward reunification to demonstrate that she was able to provide appropriate daily care to D.B. In fact, after her first incarceration, she committed two additional theft offenses and was incarcerated again. It is unclear whether she had resolved those charges by the time of the final hearing.

{¶25} D.B., who was 10 and a half years old at the time of the hearing, had expressed his desire to return to Mother's custody. Despite Mother's assertions to the contrary, the trial court did weigh that factor in its best interest analysis. The trial court also considered the significant evidence that Mother had failed to demonstrate an ability to meet the basic needs of D.B. The guardian ad litem expressed concern that Mother had stopped using cocaine but had replaced her cocaine problem with an alcohol problem. Mother worked with a substance abuse counselor for a total of eleven months but, according to the counselor, Mother never admitted that she had used cocaine when she tested positive numerous times during this case, and she denied that alcohol was ever a problem for her. Mother had gained no insight into her substance abuse problem and had failed to achieve sobriety.

{¶26} This case had been pending for well over two years and D.B. needed a legally secure permanent placement. Although D.B. was in Mother's custody for the first six years of his

life, he resided in the NICU for the first six months of his life, where he received ongoing medical care. Mother asserts that she met all the child's needs and got him to all his appointments while he lived with her, but that argument is not supported by the undisputed evidence in the record. When this case began, D.B. had not seen his primary care physician for almost two years, had not followed up with necessary care for a significant vision problem, and had missed numerous appointments with his medical specialist over the prior three years. Moreover, he was exposed to ongoing illegal drug use in the home.

{¶27} Having reviewed all the evidence before the trial court, this Court concludes that CSB presented clear and convincing evidence that permanent custody was in the best interest of D.B. *See In re Z.C.* at ¶ 13. Although Mother attempted to contradict the agency's evidence with her own testimony, the trial court did not lose its way by concluding that permanent custody was in D.B.'s best interest. *See Eastley* at ¶ 20. Mother's assignments of error are overruled.

III.

{¶28} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.


APPEARANCES:

ANDREW KARAS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.

VICTOR CHUKWUDELUNZU, Attorney at Law, for the Child.

NEIL AGARWAL, Guardian ad Litem.